**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS  DIVISION**

| | | |
|---|---|---|
| **STEPHANIE L. JORDAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Cause No. 1:08-cv–497-WTL-DML** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of the Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff Stephanie L. Jordan requests judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"), finding that Jordan was not entitled to Disability Insurance Benefits ("DIB").  The Court rules as follows.

**BACKGROUND**

Jordan was born on March 8, 1972.   She completed college in August 2002.  Her past work includes sales clerk at a balloon shop, administrative assistant at a title service company, paralegal at a law firm, customer service representative at a lending institution, and file coordinator for a commercial real estate company.  Jordan lives with her husband and two dogs.  She alleges that her disability began on October 10, 2002, as a result of severe back pain, leg nerve damage, headaches, fatigue, depression, and anxiety, all of which stem from an October 26, 1992, accident in which a semi-truck collided with her car, injuring her spine.

*Pre-Hearing Medical Evidence*

On August 28, 2001, Jordan underwent her fourth back surgery, an anterior lumbar interbody fusion at L4-5 and L5-S1 for degenerative disc disease and post-laminectomy

syndrome.  An "extremely secure" fit was obtained with the graphs.  Record at 172.  After the fusion, surgeon Terry Trammell, M.D., performed an L5 laminectomy for re-exploration of L4-5 and L5-S1 facetectomies, and an L4, L4, S1 segmental spinal fixation.  Dr. Trammell reported that due to significant scarring, the L5 nerve root was difficult to find.  *Id.* at 174.

Dr. John R. McLimore, a pain management doctor and associate of Dr. Trammell, evaluated Jordan on October 2, 2001, and opined that she experienced some psychosocial stressors and there was an anxiety component to her chronic pain.  Dr. McLimore noted that she had experienced "some difficulty with pain management throughout" her treatment and had "some difficulty coping at times with pain and may have a tendency toward over-reliance on medication."  *Id.* at 250.  Dr. McLimore recommended that Jordan wean off her medications and recommended against chronic opioid therapy because her coping was at times maladaptive.  *Id.* at 251.

About six weeks after her surgery, on October 10, 2001, Jordan told Dr. Trammell that she was experiencing pain in her left lower leg, although she felt that it was improving and the leg was gaining strength.  She walked on a treadmill or in the mall at least one mile per day.  Her foot pain was not as intense as before the operation and was "becoming less constantly present."  Her right foot experienced only intermittent pain.  *Id.* at 248.

On October 26, 2001, Dr. McLimore reported that Jordan tended towards "pain preoccupation" and symptom amplification.  Her pain was "somewhat ill-defined" and her maladaptive coping mechanisms appeared to play a role in her pain perception.  He diagnosed Jordan with chronic pain and possible opioid dependency.  *Id.* at 244.

On November 21, 2001, Jordan told Dr. Trammell that her back pain was "remarkably better" than before the surgery.  She rested frequently, but experienced minimal pain.  Her

2

intermittent leg swelling, from her knees to her ankles, was gradually subsiding, and her constant leg ache from thigh to foot was improving.  She had stopped tripping over her left foot and her gait had improved, although she still occasionally had a shooting pain in her left foot. She continued to walk a mile a day on a treadmill and occasionally walked outside.  X-rays of her back revealed that her hardware was in good position and alignment.  She was progressing satisfactorily, but had yet to completely heal.  Dr. Trammell told her that if she increased her activity too significantly, her lower back pain would increase.  *Id.* at 246-47.

Dr. Trammell's notes from a February 2, 2002, visit indicated that Jordan was "really doing very well and that she reported that she [had] some mild constant low back pain" that was occasionally sharp, but generally a minor ache.  Her leg pain was limited to an occasional twinge down her left leg to her foot lasting "just a split second."  She was off all pain medication and felt "the best that she [had] in years."  Overall, she had "made excellent progress" and was released to return to work three full days a week.  Dr. Trammell noted that Jordan hardware's prominence and the fact that she occasionally bumped it causing pain might prompt her to want to have it removed at some point.  *Id.* at 242-43.

On August 7, 2002, Jordan told Dr. Trammell that she had "vastly improved," but still suffered from occasional low back pain and leg symptoms. When Jordan asked whether her hardware could be removed, Dr. Trammell told her that he could not guarantee pain relief.  *Id.* at 241.  Dr. Trammell said she could continue working three days a week until September, a full year after her surgery, at which she could work four days a week.  *Id.* at 241.

On Jordan's alleged onset date of October 10, 2002, Dr. Trammell conducted surgery to remove her lumbar fusion hardware, which due to her thinness was palpable subcutaneously and annoyed her when she sat or lay against hard surfaces.  The left side of the L4-5 fusion

"was not as robust as . . . the right side" and was "slightly fragmented" according to Dr.

Trammell, but "[t]he L5-S1 area was quite densely secure." *Id.* at 16970. Eight days later on

October 18, 2002, Jordan told Dr. Trammell that her preoperative symptoms had resolved. *Id.*

at 240. On December 6, 2002, Jordan reported that her hardware-related pain had resolved, but

she complained of back pain localizing on the lower part of her back. She felt that she had

"dramatically" improved–about eighty percent from her status before the operation. Dr.

Trammell reported that she continued to improve and could resume her normal exercise

routine. *Id.* at 239.

The treatment notes of Dr. Michelle M. Oakerson, a doctor at Jordan's primary care

clinic, for an April 10, 2003, visit indicate that Jordan reported ongoing back pain and sleep

interruptions. Dr. Oakerson noted that Jordan had had "multiple negative experiences with

surgery (5x)" and pain management doctors, that she was not seeing Dr. McLimore any longer,

and that she wanted "to transfer care to me." Dr. Oakerson referred Jordan to Dr. Gary Wright

for pain treatment. *Id.* at 312. When Dr. Wright saw Jordan on May 14, 2003, Jordan reported

sharp and stabbing low back pain and sleep disruption. Her pain increased with prolonged

standing, walking, and sitting. Dr. Wright prescribed Methadone and scheduled facet and

sacroiliac blocks. *Id.* at 338. When two injections did not improve Jordan's condition, Dr.

Wright increased her Methadone dosage. *Id.* at 337. On June 25, 2003, Jordan told Dr. Wright

that the injections and Methadone had improved her pain control significantly. *Id.* at 333. The

medication controlled her residual low back pain, allowed her to ride her bike two and a half

miles, and helped her sleep better. *Id.* But on July 23, 2003, Jordan complained of sweating

and hot flashes, and on August 11, 2003, Jordan told Dr. Wright that the pain in her left lower

back had increased and radiated into her left leg, causing it to occasionally give out. *Id.* at 330.

Jordan requested that she be scheduled for a rhizotomy to see if it would provide pain relief. *Id.* at 332.      An August 12, 2003, an MRI showed well-positioned and solidly-incorporated anterior interbody femoral allograft fusions L5-S1 and L4-5 with laminectomies at both levels. *Id.* at 360.  The dorsolateral fusion bone had not solidly coalesced, there was mild retrolisthesis at L3-4, mild posterior annular deformity, hypertrophic facet osteoarthritis bilaterally, and mild desiccation and minimal annular bulging at L1-2 and T12-L1.  *Id.* at 360-61.  On September 8, 2003, Jordan reported that she had continued lower back pain but that the facet blocks she had undergone had helped significantly.  According to Dr. Wright, Jordan had responded well to the facet blocks and she was a good candidate for the rhizotomy she had scheduled.  *Id.* at 329.

On September 10, 2003, Jordan told Dr. Trammell that she was "delighted" with the outcome of her most recent surgeries in that she could "walk again"  *Id.* at 238.  She described her buttock and thigh pain as "a nagging nuisance type pain, not really anything incapacitating."  *Id.*  Her fusions at L4-5 and L5-S1 had seated and incorporated well, according to Dr. Trammell, but the L3-4 interspace showed a slight abnormality consistent with her symptoms.  Dr. Trammell said that Jordan had reached "status quo" and he would see her as needed.  *Id.* at 238.

Jordan underwent a rhizotomy on September 19, 2003, and three weeks later she told Dr. Wright that she had noticed benefits.  But on November 5, 2003, Jordan reported that while the rhizotomy helped, she "hurt like hell" overall and continued to experience jaw, lower back and neck pain.  Dr. Wright noted that Dr. Trammell had recommended another surgery and that Jordan was stressed.  *Id.* at 327-28.  On December 3, 2003, Jordan reported that her pain had improved and that she did not want to have a facet block because lumbar blocks had helped more with her lower back pain.  *Id.* at 411.

On November 10 and 17, 2003, Jordan underwent a psychosocial assessment, during which she reported that she suffered from anxiety and chronic pain.  She reported that she played with her dogs, read, attended church, and rode her bike, but had difficulty getting appropriate treatment at times and had experienced pain for two years.  *Id.* at 524-28.

Jordan underwent a consultative examination by Dr. Ziad Issa in December 2003.  She reported to Dr. Issa that she suffered from severe pain in her lower back that radiated to her left leg, causing significant weakness.  None of her surgeries had helped and nerve blocks and physical therapy also had not significantly relieved her pain; pain medications only helped partially.  Her left leg would give out, causing her to fall down.  She could not walk more than a block, stand for more than five to ten minutes, bend, lift, or squat because of her pain.  Dr. Issa observed that Jordan had a moderate amount of difficulty getting out of a chair and off the exam table, she could stand and walk without help, and her gait was moderately labored with slow steps and limping.  She could not walk on her heels or toes and could not tandem walk because of left leg weakness and back pain.  She had a limited range of motion in her lumbosacral spine.  Dr. Issa observed that Jordan's left lower extremity exhibited severe weakness, but that her other extremities were normal.  Her grip strength and fine finger manipulation were normal, as was the rest of her exam.  *Id.* at 157-58.

On January 7, 2004, Jordan asked Dr. Wright to perform pain relief injections, reporting that she continued to have severe low back pain and found it hard to stand or walk.  On February 4, 2004, Jordan complained of "lots of back pain" that felt like "sharp knives in" her back and again asked for injections.  On March 3, 2004, Jordan had an "exquisitely tender" back, reporting an episode of severe pain where she had had to sit for fifteen minutes. On March 31, 2004, Jordan said she experienced what felt like a new type of lower back pain, and

asked for trigger point injections.  On April 7, 2004, Jordan said that the trigger point injections had helped a lot and asked for more.  *Id.* at 406-09.

An April 14, 2004, MRI found mild hyperlordosis of the lower lumbar spine and mild vertically narrow intervertebral discs with very slight posterior bulges through the upper lumbar spine.  There was no clear evidence of a significant abnormality within her bone marrow, which  was "grossly unremarkable."  A small Tarlov cyst was noted posterior to the S2 vertebral body.  There was no evidence of significant impingement of the descending or exiting nerve roots or significant residual disc protrusion on the L4-5.   The central canal was generally within normal limits, with a mild post surgical dural ectasia at the L45.  *Id.* at 416-17.

On April 28, 2004, Jordan reported to Dr. Wright that she had suffered from severe lower back pain, leg weakness, and tingling in her left foot for the previous two months.  *Id.* at 405.  On May 24, 2004, Jordan reported major pain in her thoracic area, radiating into her ribs.  She was experiencing migraine headaches two to three times a week.  *Id.* at 398.  Jordan reported on June 30, 2004, that her lower back was "killing" her, that her neck and shoulders were tender to the touch, and that she had numbness and foot drop in her left leg.  *Id.* at 397.  On July 12, 2004, she reported that her "sharp and stabbing" pain was progressively worsening and now affected both legs.  *Id.* at 396.  Jordan reported on July 22, 2004, that the "excruciating pain" in her lower back made her feel terrible and that she had been on bed rest for the past month, although she forced herself to take short evening walks.  *Id.* at 395.  The facet blocks gave her minimal relief and her medications did not control her pain.  *Id.* at 391.

On August 7, 2004, X-rays showed mild dextroscoliotic curvature of the cervical spine secondary to upper thoracic levoscoliosis.  *Id.* at 488.  On September 17, 2004, Jordan told Dr. Wright that she could not sleep, but that her left side was feeling better and her right side had

sensitivity.  *Id.* at 390.  A month later she reported that an increased dosage of Methadone made her feel better.  *Id.* at 389.

Brian Bartley, a chiropractor who treated Jordan's back and neck pain periodically beginning in 1995, including seven treatments in August 2004, completed a physical capacities evaluation form on November 5, 2004.  Bartley opined that Jordan could sit, stand, and walk for less than an hour at a time, and no more than two hours during an eight hour day. She could occasionally lift up to twenty pounds and frequently lift five pounds.  She could occasionally bend, squat, crawl, and reach, and never climb or work at unprotected heights.  She had moderate restrictions on working around moving machinery and mild restrictions on driving automotive equipment.  *Id.* at 418.

On December 1, 2004, Jordan reported to Dr. Wright that she had nerve pain, weakness in her legs, constant lower back pain radiating down both legs, sharp middle back pain radiating around to her front, and constant shoulder pain.  *Id.* at 493.  She described her pain to Dr. Trammell as "achey, sharp, shooting and burning," with moderate to severe symptoms. The pain was the worst at night, in the morning, and at the end of the day, and while bending, twisting, lifting, sitting, standing, walking, sneezing, coughing, straining, lying down, driving, and jarring.  The pain would aggravate when she performed "activities of daily living," including bending, lifting, running, sitting, standing, walking down stairs, up stairs, long distances, and on level surfaces.  These symptoms had been constantly present for the last two years.  *Id.* at 567-68.

At a December 13, 2004, visit, Jordan reported to Dr. Trammell that she had lower back and leg pain that was constant, but worse at some times than others.  Her pain only improved with rest and medication.  Dr. Trammell noted that her gait was normal and her cervical

8

alignment neutral and observed that Tinel's test was negative bilaterally, Babinsky sign was toes down going, Spurling's sign was negative bilaterally, and Hoffman's sign was present bilaterally. Jordan was not able to heel walk on the left, had diffuse inconsistent weakness in her calf muscles, and had a decreased range of motion in her lumbar spine. Dr. Trammell's review of X-rays and MRIs of her lumbar spine found no clear evidence of nerve root impingement; he concluded that there was a slight abnormality at C3-4 that generally demonstrated normal cervical anatomy and preservation of the disk space heights, but it was not likely to produce all of her complaints. Dr. Trammell declared that there was nothing more that could be done surgically for her lower back pain, but ordered an MRI of her cervical spine because he was concerned about upper extremity findings. *Id.* at 501-05. On December 20, 2004, Dr. Sangeeta Guttikonda at the Center for Diagnostic Imaging concluded that Jordan had multilevel diffuse disc bulges involving C2-3 through C6-7 without significant spinal stenosis. She had multilevel left-sided uncovertebral hypertrophy and osteophytic spurring involving C3-4 through C6-7. *Id.* at 504.

On January 3, 2005, Jordan complained to Dr. Wright of neck pain and arm weakness; he suspected myelopathy. *Id.* at 492. In a January 11, 2005, letter to Jordan's attorney, Dr. Wright opined that she was limited to sitting, standing, and walking less than thirty minutes and no more than two hours per work day. She could not carry or lift more than twenty pounds and could not crawl, and she could only occasionally climb, squat, or bend. The letter stated that Dr. Wright did not feel that Jordan was capable of performing meaningful work, nor did he feel that accommodations could be made for her to perform sedentary work. Her condition, in his opinion, met the conditions for disability in Listing 1.04. These opinions were based on Chiropractor Bartley's November 2004 physical capacities evaluation. *Id.* at 529-30.

A February 17, 2005 electromyographic study, administered and reviewed by Dr. Raymond J. Loffer, indicated mild carpal tunnel syndrome, mild slowing of the left ulnar nerve over the elbow, but no clear evidence of other neuropathies or motor radiculopathies.  Dr. Loffer noted that there was a possible prior long-term C5 radiculopathy but that such a conclusion could not be based on the study.  A March 30, 2004, somatosensory evoked potential study showed that Jordan was normal in both upper extremities.  *Id.* at 549-52.  An April 18, 2004, letter from Dr. Loffer to Dr. Trammell reported that Jordan had left arm pain, suspicion of C5 radiculopathy, mild carpel tunnel syndrome, mild slowing of the left ulnar nerve in the left cubital tunnel area but not severe, degenerative joint disease in the neck, and an essential longstanding tremor that was not evident on that day.  *Id.* at 539-41.

Dr. Trammell's analysis of an MRI of Jordan's cervical spine on May 11, 2005, indicated disc bulging, but there were no hard neurological findings in her upper extremities.  Dr. Trammell recommended an extensive anterior decompression and fusion at the C5-6 and C6-7 levels.  *Id.* at 556.  Dr. Trammell performed the surgery on June 28, 2005.  *Id.* at 575-78.  On July 18, 2005, Jordan reported that her arm pain and numbness were less intense and frequent than before the operation and that her bilateral tremors were better.  Jordan said that her pain was mild to moderate.  Hoffman's sign was present bilaterally and her graft was in good position and alignment.  *Id.* at 573.  Jordan told Dr. Wright on August 2, 2005, that her neck and arms had improved, but that she had pain in her thoracic area.  *Id.* at 595.  She told Dr. Trammell on August 10, 2005, that as a result of the surgery her pain was less intense and frequent and that her neck, shoulder, and arm pain had improved dramatically.   She said that she experienced a "stabbing pain" radiating to her shoulder when she raised either of her arms, numb finger tips, intermittent left arm pain, a shocking pain at the cervicothoracic junction if

10

she raised her arm, and a new thoracic central back pain radiating around both sides to her

sternum.  Overall, Dr. Trammell reported that Jordan felt much better and was happy with the

surgery's results.  *Id.*  Jordan's X-rays looked "absolutely perfect," according to Dr. Trammell.

*Id.* at 570-71.  However, on August 29, 2005, Jordan said that her back was really bothering her

again.  *Id.* at 592.

### *Hearing Testimony*

Jordan testified that she underwent surgery on her back in 1994, 1996, 1998, 2001, and

2002, and on her neck in June 2005.  After the first three surgeries she returned to work, but

missed a significant number of days due to pain and nausea.  After her fourth surgery in 2001,

Jordan took a significant amount of time off work, and after her fifth surgery on October 10,

2002, she did not return to work because her "body just started giving out."  *Id.* at 674-75.  At

the time of the hearing, she reported severe pain, taking a lot of medication, lack of stamina,

difficulty sleeping, tiredness, and an inability to work.   She went to a pain doctor every month,

took Methadone, injections, and underwent two rhizotomies.  The Methadone made her feel

"very hot" and tired, limited her concentration, caused bowel problems, and occasionally made

her nauseous.  She also suffered from pain on the outside of her calf and her foot, shakiness in

her hands, and numbness in her fingertips.   Her pain level was five on a scale of one to ten on

her best days, and generally six or a seven.  *Id.* at 681-82.

Jordan testified that she took pain medication first thing in the morning and then sat

down, rested, and ate cereal for breakfast.  Occasionally she went shopping with her mother for

about an hour or went grocery shopping with her husband.  She could not lift anything and

would sit to avoid fainting while waiting at the check out aisle or when her pain intensified.

On a good day, Jordan watched television, listened to the radio, read, folded clothes if her

11

husband sat them out for her, and dusted around her home.  She attempted to attend church

services on Sunday mornings, but only if she could bear her pain.  About every two weeks she

went out to eat with a group of friends, but would go home and sleep afterward due to the pain.

She volunteered for two hours at her church's food pantry every few months, helping people

fill out forms and verifying identities.  She testified that she had not driven in three months, had

frequent panic attacks, and used to see a counselor.  *Id.* at 675-90.

Orthopedic surgeon Arthur Lorber testified as a medical expert at the hearing.  Dr.

Lorber noted that Jordan's December 2004 MRI revealed "minor multi level disc bulges of the

type that one would not ordinarily" operate on; her February 2005 EMG of her upper extremity

revealed no clear evidence of cervical radiculopathy; and the March 2005 somatic sensory

evoke response of her left upper extremity was normal.  Dr. Lorber testified that the June 2005

cervical surgery was performed despite the lack of significant objective findings of serious

cervical problems and that it appeared to be healing well.  Dr. Lorber did not believe that

Jordan met or equaled listing 1.04A.  He believed that Jordan would be restricted to sedentary

work, which involved lifting no more than ten pounds occasionally, no standing or walking for

more than two hours per day, no working at unprotected heights, no climbing of ladders,

scaffolds, or ropes, no balancing, no work on slippery, wet, or uneven surfaces, no exposure to

vibrations, no crawling, and only occasional bending, stooping, or kneeling.  *Id.* at 697-99.

Vocational expert Ray Burger testified at Jordan's hearing that her past relevant work

was sedentary and would fall under the categories of administrative assistant, receptionist,

mortgage processor, and accounts payable clerk.  In response to the ALJ's request to consider a

hypothetical individual with the residual functional capacity set forth by Dr. Lorber, Burger

said that such an individual would be able to return to Jordan's past relevant work.  In response

to a request by Jordan's attorney to consider a hypothetical individual limited as set forth by Jordan's chiropractor and Dr. Wright, Burger said that such an individual could not perform Jordan's past work or any other work.  Burger also testified that a person who needed to rest for periods of time during the work day could not perform competitive work.  *Id.* 706-10.

### Post-Hearing Medical Evidence

Jordan submitted additional evidence that related to medical treatment she received after the hearing.  Those records indicate that during a September 26, 2005, follow up with Dr. Trammell, she reported no surgery-related pain and a 100 percent improvement.  All of her preoperative symptoms of headaches, neck pain, bilateral arm pain, and numbness were completely resolved, but her lower back pain remained "the same and her limiting factor." Overall, Dr. Trammell reported that Jordan appeared to be doing very well.  Her neck was "doing marvelously well" and she had achieved a near complete recovery of all headaches, neck pain, and bilateral arm pain and weakness.  He noted that this was not the case with her lower back, and that she suffered from a post-laminectomy syndrome that markedly limited her mobility and endurance.  Dr. Trammell opined that Jordan was not able to sit, stand, or walk in the course of employment over a forty hour week and stated that he "would think it would not be possible for her to hold down a job of any kind that would require her to have continued activity during 40 hours [a] week."  *Id.* at 588-90.

At a September 26, 2005, visit, Jordan reported to Dr. Wright that she was doing very well and that her main problem was with her lumbar spine.  On October 24, 2005, Jordan told Dr. Wright that she was doing about the same and that her neck and back pain had improved, but that she had increased pain in her thoracic area.  Jordan reported on November 28, 2005,

that she had had a lot of pain in her neck, thoracic area, and lower back during the previous month.  *Id.* at 644, 646-48.

Dr. Wright's notes indicate that on January 30, 2006, Jordan reported that she was doing "o.k."  On February 27, 2006, Jordan said her neck pain had increased, along with her thoracic and lower back pain, but Dr. Wright noted that surgery was not recommended for her thoracic back.  On April 3, 2006, Jordan reported that her right hand hurt and was swollen from painting.  On May 2, 2006, Jordan reported no change in her neck and back pain.  On May 30, 2006, Jordan reported that trigger point injections had "helped a lot."   On June 29, 2006, Jordan reported pain in her neck, upper back and lower back, along with severe pain in both legs.  *Id.* at 630-40.   On September 26, 2006, Jordan said that her medications were controlling her pain and she was doing much better, but that she was nervous about long-term use of Methadone.  *Id.* at 617.

Internal medicine specialist Dr. Robert B. Chevalier wrote a letter to Jordan's attorney on October 10, 2005, in which he opined that Jordan's condition was complex and involved "severe neurologic problems as well as significant neurologic manifestations."  Dr. Chevalier stated that Jordan met the requirements for Listing 1.04A.  He also believed that she met the requirements for Listing 11.14 as described under Listing 11.04B and probably met the requirements for Listing 11.08.  *Id.* at 611-13.

In a November 14, 2005, letter to Jordan's attorney, orthopedic surgeon Dr. James W. Lyons stated that he strongly believed she met the requirements of Listings 1.04A and 1.04B and may also have met Listing 1.00B.  *Id.* at 614-15.

14

A July 6, 2006, MRI of Jordan's lumbar spine indicated stable post-operative changes at L4-5 and L5-S1 with no new abnormalities. *Id.* at 653-54. A July 27, 2006, lumbar spine X-ray showed degenerative and post-operative changes at L-4-5 and L5-S1. *Id.* at 652.

## STANDARD OF REVIEW

To be eligible for DIB, a claimant must be disabled under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1. If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, then it shifts to the Commissioner at the fifth step. *See Overman v. Astrue,* 546 F.3d 456, 464 (7th Cir. 2008).

The Social Security Act ("Act"), specifically 42 U.S.C. §405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of

the ALJ's findings, the ALJ's findings become findings of the Commissioner. *See, e.g.*, *Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Scheck v. Barnhart,* 357 F.3d 697, 699 (7th Cir. 2004). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307. In other words, the ALJ must clearly articulate his analysis of the evidence, building an accurate and logical bridge from the evidence to his conclusion. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence." *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

## ALJ'S DECISION

The ALJ found that Jordan met the insured status requirements of the Act through December 31, 2007. At the first step of the disability analysis, the ALJ found no evidence that

Jordan had engaged in substantial gainful activity since her alleged onset date.  Next, the ALJ determined that Jordan had severe impairments relating to a laminectomy and fusion of the spine, fusion of the neck, and disorders of the back.  But the ALJ found that Jordan did not have a severe mental impairment because her mental impairment would only have a minimal effect on her work capacity.  At the next step, the ALJ found that Jordan did not have an impairment or combination of impairments that were medically equivalent to the impairments specified in Listing of Impairments 1.04(A), 1.04(B), 11.14, 11.04, and 11.08.

Between steps three and four, the ALJ determined that Jordan had the residual functional capacity ("RFC") to perform a range of sedentary work requiring lifting up to ten pounds at a time; occasionally lifting or carrying items such as docket files, ledgers, and small tools; sitting for six hours during an eight hour work day; walking and standing for two hours during an eight hour work day; and occasionally bending, stooping, and kneeling.  The ALJ determined that Jordan could not work at unprotected heights or on slippery, wet or uneven surfaces; climb ladders, ropes, or scaffolds; balance herself; crawl; or be exposed to vibrations. At step four, the ALJ determined that Jordan could perform her previous relevant work as an administrative assistant, mortgage processor, accounts payable clerk, and receptionist because this work does not require activities precluded by Jordan's residual functional capacity. Therefore he determined that she was not disabled as defined by the Act from October 10, 2002, through the date of his decision.

## ANALYSIS

Jordan advances several arguments on appeal, each of which is addressed, in turn, below.

### *ALJ's Treatment of Dr. Trammell's Reports and Opinions*

Jordan first argues that the ALJ erroneously evaluated the reports and opinions of Dr. Trammell, Jordan's treating orthopedic surgeon.  Specifically, Jordan argues that she should have been found disabled based upon Dr. Trammell's September 2005 note in which he opined that she was "certainly not able to sit, stand or walk in the course of her employment over 40 hours per week" and that "it would not be possible for her to hold down a job of any kind that would require her to have continued activity during 40 hours [in a] week."  Record at 590.  She asserts that Dr. Trammell's "longitudinal opinions show that he reported that Jordan could not work full-time" and that Social Security Ruling (SSR) 96-8p provides that a person who cannot work full-time is disabled.

SSR 96-8p provides that "[o]rdinarily, RFC is assessment measures of an individual's ability to do sustained work-related physical and mental activities on a regular and continuing basis," which is defined as "8 hours a day, for 5 days a week, or an equivalent work schedule." Further, in order to perform a full range of sedentary work, "an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals."  SSR 96-9p. Dr. Trammell's note certainly can be read, as urged by Jordan, to mean that he believes she is incapable of performing sedentary work as defined by the Commissioner.  The ALJ, however, determined that "Dr. Trammell's opinion is not necessarily inconsistent with the extremely modest residual functional capacity that I have assessed for the claimant," reasoning as follows:

> Dr. Trammell's notes state that the claimant is certainly not able to sit, stand or walk in the course of her employment over 40 hours per week.   Dr. Trammell continues to say that he does not think it would be possible for the claimant to hold down a job of any kind that would require her to have continued activity during forty hours a week as stated above.  However, ordinarily a residual functional capacity is an assessment of an individual's ability to do sustained

> related activities in a work setting on a regular and continuing basis, meaning
> eight hours a day, for five days a week.  Furthermore, during the usual work day
> an individual would receive customary breaks and a lunch period.

*Id.* at 26 (citations omitted).  While the ALJ might be right in his assessment of Dr. Trammell's

opinion, the Court agrees with Jordan that he should have sought clarification from Dr.

Trammell to be sure, inasmuch as it is equally plausible that Dr. Trammell does, in fact, believe

that Jordan cannot work full-time as that is defined by the Commissioner.

Perhaps the ALJ did not bother to seek clarification because he believed the issue was

moot in light of his alternative holding:

> To the extent that Dr. Trammell's opinion is inconsistent in that he means that
> the claimant is incapable of working at even a sedentary level, I find his opinion
> not support[ed] by the evidence.  Dr. Trammell's notes from the visit at which
> this opinion is given report that the claimant's cervical back symptoms were
> completely resolved and that her lower back remained the same.  Previously,
> Dr. Trammell's visit notes following the claimant's recovery from her lumbar
> fusion indicate that the claimant's lower back condition was status quo and
> doing fine.  In addition, prior notes report some nuisance type pain, but nothing
> really incapacitating, and no limitations, no weakness, and no sensory loss.
> While Dr. Trammell's notes continued to report that the claimant has some
> stable symptoms referable to her lumbar impairment, his statements regarding
> her condition do not indicate that these symptoms would prevent her from doing
> even sedentary work.

*Id.* (citations omitted).  However, this analysis also is problematic.

First, as Jordan points out, the statements in Dr. Trammell's records pointed to by the

ALJ must be considered in context.  As the court noted in *Micus v. Bowen*, 979 F.2d 602, 606

(7th Cir. 1992), "[a] quadriplegic, for example, may 'feel well' or may 'feel good' but be

unequivocally disabled; whereas, someone with the common cold may report 'feeling terrible'

but be mostly able to perform his or her usual and customary work."  The fact is that Dr.

Trammell noted that Jordan was "holding her own" and had reached "status quo" in September

2003, but that is not necessarily inconsistent with being disabled.  Further, the notation that she

19

had "no limitations, no weakness and no sensory loss" referred to her lower extremities, and therefore is irrelevant to the issue of whether she continued to have disabling back pain. Therefore, Dr. Trammell's treatment records do not provide support for the ALJ's non-disability finding.

That is not the end of the inquiry, however.  Dr. Trammell's opinion as Jordan's long-time treating physician is entitled to significant, but not necessarily controlling, weight.  The "treating source rule," outlined in 20 C.F.R. § 404.1527(d)(2), instructs an ALJ "to give controlling weight to the medical opinion of a treating physician if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence.'"  *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quoting *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006)).  If the evidence supports a treating physician's medical opinion and contradictory evidence does not exist, an ALJ lacks a basis to reject it.  *Id.*  But if conflicting evidence exists, the treating physician's evidence does not receive controlling weight.  *Id.*  Rather, the treating physician's evidence is merely additional evidence for the ALJ to consider using a variety of factors, including the length of time and how often the treating physician examined the claimant.  *Id.*

In this case, the conflicting evidence relied upon by the ALJ was the testimony of Dr. Lorber, an orthopedic surgeon who testified as a medical expert at the hearing but who had never examined Jordan himself.  The Seventh Circuit has given contradictory guidance regarding the interplay of the opinions of treating and non-examining physicians.  *Compare Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (citing *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)) ("An administrative law judge can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory

opinion of a non-examining physician does not, by itself, suffice."); with *Bauer*, 532 F.3d at

608, and *Hofslien*, 439 F.3d at 376 (both reaching the opposite conclusion without addressing

*Young* or *Gudgel*).  However, under either line of cases the result is the same in this case:  the

ALJ"s reliance on Dr. Lorber's testimony was improper.

Dr. Lorber's testimony consisted of a summary of some of Jordan's medical records

and the following remarks:

> [A]s a matter of fact, with regard to her lumbar issue, on 7 August '02 x-rays
> were obtained which were interpreted as revealing healing, or that the fusion
> had been healed and she was advised to return to work on the 2nd of September
> '02, 4 days per week.  So it was Dr. Trammell, the operative surgeon's opinion,
> that was with regard to her lumbar spine she was capable of performing
> employment on a frequent basis."

He also opined, without elaboration:  "With regard to her lumbar condition it is my opinion

that she does not meet or equal listing 1.04A.  *Id.* at 699.  He then stated that Jordan  was

capable of performing work at a sedentary level with certain non-exertional restrictions, but

gave no explanation for his RFC finding.  Like the consultant in *Bauer*, Dr. Lorber "did not

identify a flaw in the treating physicians' analysis, but merely expressed a contrary view after

reading the medical files."  *Bauer*, 532 F.3d at 608.

Actually, it appears from Dr. Lorber's testimony that he believed his RFC

determination was consistent with the opinion of Dr. Trammell that Jordan could work four

days a week.  Upon questioning by Jordan's counsel regarding what he thought of the RFC

opinions of pain specialist Dr. Wright and chiropractor Barkley, Dr. Lorber stated that he gave

those opinions very little weight.[1]  He then stated:  "Well, I would say, you know, who are we

---

[1]Dr. Lorber's opinion regarding Dr. Wright was based upon his "understanding" that
Dr. Wright had been "eliminated by the Indiana University Orthopedic residency after his first
year for reasons of dishonesty" and therefore he "has no special training, in my estimation,
beyond that of a general practitioner."  *Id.* at 702.  There is no indication of how Dr. Lorber

going to – when we weigh the evidence Dr. Trammell, a well thought of orthopedic surgeon

here in town who's a spinal specialist, said this patient could return to work four days per

week.  Am I to ignore that and to give controlling weight to Dr. Wright's evidence, I think

not."  *Id.* at 703.  However, Dr. Lorber's RFC was not consistent with Dr. Trammell's opinion

because, as explained above, Dr. Lorber's opinion that Jordan could work at the sedentary level

implicitly included a determination that she could work eight hours a day, five days a week.  In

the absence of an explanation of this discrepancy by Dr. Lorber–who himself testified that he

believed Dr. Trammell's opinion was credible–it was error for the ALJ to reject Dr.

Trammell's opinion regarding Jordan's ability in favor of Dr. Lorber's unsupported RFC.

### *ALJ's Omission from RFC of Limitations on Handling and/or Fingering*

Jordan next argues that it was error for the ALJ to omit her problems with handling

and/or fingering from his RFC discussion.  The ALJ recognized in his decision that Jordan's

medical records indicated that she had mild postural tremors in her hands, positive Hoffman's

signs bilaterally, left arm numbness, mild carpal tunnel syndrome, mild slowing of the left

ulnar nerve over her elbow, and increased polyphasic activity. Record at 20-21.  However, the

ALJ further noted that tests showed no clear evidence of other neuropathies or motor

radiculopathies and that somatosensory evoked potentials of both upper extremities were

normal.  *Id.* at 21.  Jordan points to nothing in the record that would support a finding that she

had symptoms in her hands that were significant enough to affect her ability to perform

handling or fingering.  Her application for disability benefits makes no mention of upper

extremity abnormalities, let along any limitations on handling or fingering, *id.* at 90, 93, and

although she testified at her hearing that her neck surgery had helped her arm strength but that

_____

arrived at this "understanding."

22

she still had "some shakiness in my hands and my fingertips are numb," *id.* at 686-87, neither the ALJ nor Jordan's attorney included any limitation on handling or fingering in their hypothetical questions to the vocational expert at the hearing.

The presumption is that claimants represented by counsel "have made their best case before the ALJ." *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007). Given the absence of evidence in the medical records and testimony at the hearing regarding any limitations caused by Jordan's hand issues, the ALJ's failure to include such limitations in his RFC assessment was not error.

### *ALJ's Credibility Determination*

Jordan next argues that substantial evidence does not support the ALJ's credibility finding. "'Because the ALJ is in the best position to observe witnesses, [the Court] will not disturb [a] credibility determinations as long as they find some support in the record.'" *Schmidt v. Astrue*, 496 F.3d 833, 843 (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1178-79 (7th Cir. 2001)). As such, "[the Court] will reverse an ALJ's credibility determination only if the claimant can show it was patently wrong.'" *Id.* (quoting *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003) (internal quotations and citations omitted)). An ALJ's credibility determination is entitled to "special deference" because of the ALJ's unique ability to observe and evaluate testimony. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Nevertheless, the Court will reverse a credibility determination when the ALJ fails to give specific reasons for the finding that are supported by the record. *See Brindisi ex el. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). Finally, in evaluating the credibility of a claimant's testimony, an ALJ must comply with the requirement of Social Security Ruling 96-7p to articulate the reasons behind credibility evaluations:

The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

In this case, the ALJ explained at length his reasons for finding Jordan's allegations

regarding the location, duration, frequency, and intensity of her symptoms not totally credible:

The evidence in the record demonstrates that on December 6, 2002, shortly after the removal of her hardware, she was allowed to return to her routine exercises and activities by her treating physician, Dr. Trammell. This included playing with animals, riding a bicycle, and doing aerobics. Furthermore, as of May 14, 2003, she was looking for a job. In addition, visit notes from September 10, 2003 reported that claimant had some tenderness and difficulty with extension, but that her pain was a nuisance type pain and not really anything incapacitating. Furthermore, as of that visit Dr. Trammell noted that there were no other focal or localizing findings in the lower extremities, no limitations, no weakness, and no sensory loss. At this time, the claimant expressed that she was delighted with the outcome of her surgery because she could "walk again." Dr. Trammell noted that x-rays at this time showed that the 3-4 interspace tended to retrolistheses slightly on extension and reduce in flexion which was consistent with the claimant's clinical symptomatology at that level. However, when the claimant's alleged symptoms later increased, Dr. Trammell noted that this retrolistheses was not likely producing all of her complaints. Furthermore, Dr. Trammell's visit notes from December of 2004 indicate that the claimant's condition had not declined and that overall the claimant was doing fairly well. Thus, the claimant's statements to Dr. Trammell, which indicate that her lumbar fusion was successful and her condition was vastly improved, and the claimant's statements in her disability report are inconsistent. In addition, the claimant's statements during her September of 2003 visit with Dr. Trammell and those to the consultative examiner on December 22, 2003 also appear inconsistent. During the visit with the consultative examiner the claimant reported that none of her surgeries helped and that she continued to have severe pain in her lower [b]ack that radiated to her left leg and significant left leg weakness. Furthermore, the consultative examiner noted that the claimant was limping and had a moderate gait with slow steps. However, visit notes from Meridian Health Group repeatedly reported that the claimant ambulated normally from May of 2003 through August of 2006. Although I acknowledge that the Meridian Health Group visit notes indicate the claimant had some difficulty ambulating due to a problem with her left leg on a few occasions over this time period, the vast majority of the time the claimant's gait was normal.

24

> Thus, the medical record does not support the claimant's allegations that she has difficulty walking due to nerve damage in her left leg. However, I acknowledge that there is evidence in the record that the claimant does have some weakness in her left leg which she reports causes her to trip at times and interferes with her ability to balance. I have taken this into consideration when assessing her residual functional capacity. Accordingly, under the residual functional capacity set out above she cannot: work at unprotected heights; climb ladders, ropes or scaffolds; balance; work on slippery, wet, or uneven surfaces; or be exposed to vibrations. These measures adequately account for her left leg weakness.

Record at 23. While this explanation is thorough, it is based, in large part, on Dr. Trammell's various comments along the lines that Jordan was doing "well." As discussed above, the ALJ's interpretation of those comments as contradicting Jordan's claim of disabling back pain is problematic. Therefore, on remand the ALJ should reevaluate his credibility determination.

### *ALJ's Finding the Jordan Could Occasionally Stoop*

Finally Jordan, citing *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003), argues that the ALJ's determination that Jordan could occasionally stoop was error in light of the evidence on record that Jordan had reduced forward flexion. Jordan acknowledges that any error in this regard was harmless because none of the jobs the ALJ found Jordan capable of doing require any stooping. However, if it becomes relevant on remand, the ALJ should consider whether Jordan's limited forward flexion is inconsistent with stooping.

### CONCLUSION

For the reasons stated herein, the cause is **REVERSED AND REMANDED** for further proceedings consistent with this opinion.

SO ORDERED:   09/18/2009

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification